UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES AVIATION UNDERWRITERS INC. | § § § |
| VS. | §   CIVIL ACTION NO. H-07-2485 § |
| UNITED STATES OF AMERICA | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I. Background

This is a negligence action brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* Early on the morning of November 22, 2004, a Gulfstream jet bearing federal registration number N85VT (hereinafter "N85VT") crashed while attempting to land at William P. Hobby Airport in Houston, Texas ("Hobby"). The weather was bad that morning, with poor visibility, low cloud ceilings, and thick fog. Plaintiffs, Billie Dickson, Charisse Lynette Groennieer, Keith Dickson, Sandra Lee DeSalvo, Ann Charlotte Spees DeSalvo Degutis, Bridget DeSalvo Clough, Lara S. Linden, and Michael DeSalvo III, the surviving relatives of the two pilots, and United States Aviation Underwriters, Inc., as aviation managers for United States Aircraft Group and its participating insurers ACE American Insurance Company, Hartford Fire Insurance Company, Liberty Mutual Insurance Company, and Zurich Aviation Insurance Company, a/s/o The Jet Place, Inc. d/b/a Business Jet Services, Inc., the hull's insurers, bring this consolidated action against the United States of America, alleging that air traffic control was negligent in handling the approach and landing of N85VT at Hobby. The Government denies liability, contending that N85VT crashed because of pilot error. The case was tried to the bench from September 28, 2009 to October 8, 2009. Accordingly, the Court hereby issues the

following Findings of Fact and Conclusions of Law.

II. <u>Findings of Fact</u>

These factual findings are drawn from the Admissions of Fact contained in the Joint Pretrial Order (Doc. 28) as well as the admitted exhibits and testimony heard at trial.

1. Plaintiff The Jet Place, Inc. ("Jet Place") owned the Gulfstream G-1159A aircraft N85VT.

2. Plaintiff U.S. Aviation Underwriters, Inc. ("USAU") insured Jet Place for property damage to N85VT.

3. The fair market value of N85VT at the time of the accident was approximately eight million dollars.

4. N85VT was destroyed in the crash at issue in this lawsuit.

5. USAU paid Jet Place an amount in excess of the fair market value for the loss of N85VT pursuant to the terms of the insurance policy, is the appropriate party to assert the claim as subrogee of Jet Place, and is fully subrogated for the fair market value of N85VT.

6. Defendant United States of America, by and through its agency, the Federal Aviation Administration ("FAA"), owned, operated, maintained, controlled, managed, inspected, and conducted air traffic control facilities and operations known as Houston Intercontinental Terminal Radar Approach Control ("TRACON") and the Hobby Control Tower in Houston, Texas.

7. Defendant United States of America employed at the facilities and airport certain air traffic controllers, personnel, and employees, who at all times were acting within the

course and scope of their employment as air traffic controllers and air traffic service facility personnel and employees of the United States government.

8. Houston TRACON is responsible for providing approach control service to all airports in the Houston area.

9. Houston TRACON is equipped with an automated radar tracking system, which includes Minimum Safe Altitude Warning ("MSAW") software to monitor aircraft separation from terrain and obstacles.

10. The MSAW system performed as programmed on the morning of the accident.

11. N85VT was equipped with a Ground Proximity Warning System.

12. N85VT was certified for flight in instrument meteorological conditions.

13. Pilots are required to carry a runway approach plate for Instrument Landing System ("ILS") approaches.  The approach plate contains the Minimum Descent Altitude ("MDA"), the crossing altitude for the Final Approach Fix, the runway's localizer frequency and Morse code identification, and instructions for missed approach procedures.

14. On the morning of November 22, 2004, the pilots of N85VT were Captain Milford Dickson ("Dickson") and First Officer Michael Francis DeSalvo ("DeSalvo").  Each pilot had nearly four decades of flying experience and each held an Airline Transport Pilot ("ATP") license from the FAA.  Also on board was Kristi Dunn, the flight attendant.

15. On the morning of November 22, 2004, N85VT was operated under 14 C.F.R. Part 91 on an Instrument Flight Rules ("IFR") flight plan.

16. The flight, originally scheduled to leave at 5:00 a.m., was delayed due to poor weather conditions at both Hobby and Dallas Love Field Airport ("Love Field") in Dallas, Texas.

17. The flight departed from Love Field at about 5:30 a.m. on November 22, 2004.

18. After departure from Love Field, the flight crew received Automatic Terminal Information Service ("ATIS") from Hobby reporting that winds were calm and visibility was "one-eighth statute mile and fog, the runway visual range for runway four was variable, between 1,600 and 2,400 feet and the clouds were broken at 100 feet and overcast at 9,000 feet."

19. During the flight, Dickson handled the aircraft's flight controls, while DeSalvo handled the navigational duties, including tuning and identifying radios and communicating with air traffic control.

20. Because only the flight crew, consisting of the two pilots and the flight attendant, was on board, the flight to Hobby operated under 14 C.F.R. Part 91, which covers private as opposed to charter flying. Aircraft operating under Part 91 are permitted to attempt ILS approaches in weather below the normal ceiling and visibility landing minimums.

21. At the time of the accident, the pilots were attempting to execute an ILS guided landing on runway four at Hobby.

22. At 5:50 a.m., DeSalvo set the jet's navigation radio to Hobby's Very High Frequency ("VHF") Omni-directional Range ("VOR") radio frequency of 117.1 MHz.

23. At 5:58 a.m., DeSalvo contacted Houston TRACON, which provides radar approach control services to airplanes in the Houston area airspace, including Hobby. Air Traffic Control Specialist George O'Donnell ("O'Donnell"), who was responsible for operations at Houston TRACON that morning, answered the radio call. O'Donnell instructed the crew of N85VT to descend to three thousand feet and proceed to the CARCO[1]

---

[1] CARCO is the first of three navigational approach fixes on the ILS approach to runway four at Hobby. The subsequent two approaches fixes are called ELREN and EISEN.

intersection on the ILS runway four approach to Hobby.  The pilots acknowledged the instruction.

24. At 5:59 a.m., DeSlavo told Dickson, "I'll set up our ILS, in here, one oh nine nine." DeSalvo then entered this ILS frequency in the navigation radio on the "standby" position, but neglected to toggle the ILS frequency to the "active" position.  The crew should have checked that the navigation radio was properly tuned by listening for the Morse code identification signal broadcast on the ILS frequency.  Because the ILS frequency was not set to "active," DeSlavo could not have heard this signal.

25. At 6:09 a.m., DeSalvo told Dickson, "I'll go ahead and set your CDI$^2$ up to your inbound course of zero three nine degrees."  DeSalvo then set the inbound ILS runway four course on Dickson's Horizontal Situation Indicator ("HSI")$^3$.

26. At 6:10 a.m., O'Donnell instructed N85VT to fly a heading of 70 degrees and issued the approach clearance for ILS runway four at Hobby.  He further instructed the crew to maintain a minimum altitude of two thousand feet until they were established on the localizer.

27. At 6:11 a.m., O'Donnell instructed the pilots to contact the Hobby control tower for landing clearance.  Air Traffic Control Specialist Thomas Denison ("Denison") was on duty in the Hobby control tower that morning.

28. At 6:11:58 a.m., N85VT told Denison, "Gulfstream 85VT is with you on the ILS."  This statement was inaccurate, however, as the ILS radio frequency was still in the "standby" position.  Denison acknowledged N85VT's radio call and issued the landing clearance for runway four.

---

$^2$ Course Deviation Indicator.
$^3$ The HSI is an instrument that combines both the heading indicator and the CDI.

29. At 6:12 a.m., Dickson noticed he was not getting ILS data on his navigation instruments.

    Dickson: "I can't get . . . approach mode on my thing."

    DeSalvo: "I can't get an approach mode on mine either.  uuh, I wonder why?"[4]

30. At 6:13 a.m., Dickson said, "we're high on the glideslope now."  This remark was inaccurate, however, as the jet was still navigating relative to the Hobby VOR frequency, not the far more accurate ILS runway four signal the pilots thought they were using. With the radio tuned to the incorrect frequency, the pilots were getting no glideslope information at all.

31. The pilots continued to puzzle over their inability to engage the "approach mode" of the Flight Guidance System, which requires an ILS signal to operate.  Finally, Dickson says, "[We're] just gonna have to do it this way."[5]

32. At 6:14 a.m., as the airplane descended through 1,000 feet, DeSalvo discovered his mistake with the radio and switched the ILS frequency to the "active" position.  The precise ILS localizer signal caused the instruments to shift suddenly in response to the new data.

    Dickson: "Oh my, what'd you do to me?  Whoa [expletive].  What happened?  Did you change my frequency?"

    DeSalvo: "Yeah we were down there . . . the VOR frequency was on."

    Dickson: "I don't know if I can get back on it in time."

    DeSalvo: "Yeah you will.  You're all squared away now."

    Dickson: "Yeah but . . ."

    DeSalvo: "You got it."

---

[4] NTSB Factual Report, Cockpit Voice Recorder ("CVR") Transcript at 27.  (Plaintiffs' Exh. 1.)
[5] NTSB Factual Report, CVR Transcript at 29.

>Dickson: "Yeah, but I, I don't know if I can get back on it, in time."
>
>DeSalvo: "Yeah you will. You're squared away now."[6]

33. At 6:14:44, N85VT descended below the Minimum Descent Altitude ("MDA") listed on ILS approach chart and the FAA's minimum safe altitude. This descent triggered the MSAW system's low altitude alert in the Hobby control tower.

34. Three seconds later, Denison radioed a warning to the pilots: "Gulfstream eight five victor tango check your altitude indicates four hundred feet." N85VT never responded.

35. Although instrument and radar data show the pilots attempted to pull up, the jet struck a light pole, lost a wing, and crashed.

36. The two pilots and flight attendant died instantly on ground impact.

37. At trial, David Jackson ("Jackson"), an air traffic controller at Ellington Field airport in Houston, Texas, testified that while completing a weather observation at the Ellington Field tower on the morning of November 22, 2004, he saw lights belonging to an airplane he believed to be N85VT flying at an unsafe altitude. (Doc. 41 at 8-10.)

38. Jackson testified he used the "shout line," a dedicated tower-to-tower communication channel, in an attempt to notify the Hobby tower of N85VT's unsafe altitude. *(Id.* at 11.) Receiving no reply, Jackson next attempted to reach Houston TRACON via the shout line, again with no response. (*Id.*) He eventually succeeded in contacting the Hobby tower, but only after N85VT had crashed. While there is a recording of Jackson's post-crash communication with Hobby, there is no record of his prior unsuccessful attempts to contact Hobby or Houston TRACON.

---

6 NTSB Factual Report, CVR Transcript at 30–31.

39. Given the prevailing weather conditions and the distance between the Ellington Field tower and the flight path of N85VT that morning, the Court finds it extremely improbable that Jackson saw lights belonging to N85VT.  (*See* Defendant's Exh. 63.)  Furthermore, while the Court does not doubt that Jackson attempted to contact both the Hobby tower and Houston TRACON facilities, it seems likely that he incorrectly operated the shout line during the unsuccessful attempts.

III.  Conclusions of Law

1. The Court has jurisdiction over this case pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1), §§ 2671–2680.

2. Texas substantive law applies to common law claims such as negligence.  *See* 28 U.S.C. § 1346(b)(1); *Richards v. United States*, 369 U.S. 1, 82 (1962).

3. In Texas, the elements of common law negligence are: (a) a legal duty to use due care; (b) breach of such legal duty; (c) proximate causation, or breach as the "substantial factor" of the resulting injury; and (d) damages.  *Kroger v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006); *see also Morin v. Moore*, 309 F.3d 316, 326 (5th Cir. 2002).  Plaintiffs bear the burden of proving each element by a preponderance of the evidence.  *Id.*

4. The Texas comparative negligence statute provides that claimants "may not recover damages if [their] percentage of responsibility is greater than 50 percent."  Tex. Civ. Prac. & Rem. Code § 33.001.  Therefore, to recover, Plaintiffs must show that the pilots' responsibility for this accident is not greater than fifty percent.

5. "In airplane tort cases, general negligence law applies; however 'the standard of due care is concurrent, resting upon both the airplane pilot and ground aviation personnel.  Both

are responsible for safe conduct of flight.'" *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 838 (9th Cir. 1995) (quoting *Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir. 1972)).

6. "The Air Traffic Controller (ATC) must perform certain functions necessary to the maintenance of a high degree of aviation safety, yet the pilot is burdened with the ultimate responsibility for the prudent handling of his aircraft." *Beech Aircraft Corp.*, 51 F.3d at 839 (citing *Richardson v. United States*, 372 F. Supp. 921, 925 (N.D. Cal. 1974)).

7. "Once an air traffic controller has given clearance to land, it is incumbent upon the pilot to assume responsibility for the proper and safe landing of the craft." *Id.* at 839–840 (citing *Sanbutch Properties, Inc. v. United States*, 343 F. Supp. 611, 616 (N.D. Cal. 1972)).

8. "The [FAA] has promulgated regulations (FARs) that govern, inter alia, the operation of airplanes by pilots." *In re N-500L Cases*, 691 F. 2d 15, 28 (1st Cir. 1982).

9. The Federal Aviation Regulations ("FARS") are the "rules of the road" for pilots, "have the force and effect of law, and their violation in negligence *per se*." *Id.* (internal citations omitted).

10. "The FAR's in turn require pilots to know and follow the Airman's Information Manual." *Rodriquez v. United States*, 823 F. 2d 735, 739 (3d Cir. 1987); 14 C.F.R. § 61.105(a).

11. The FARS provide that "[t]he pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." 14 C.F.R. § 91.3(a); *Redhead v. United States*, 686 F.2d 178, 182 (3d Cir. 1982), *cert. denied*, 459 U.S. 1203 (1983); *Black v. United States*, 441 F.2d 741, 744 (5th Cir. 1971); *American Airlines, Inc. v. United States*, 418 F.2d 180, 193 (5th Cir. 1969). The pilot has the "final authority,

even over the air traffic controllers." *In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975*, 635 F.2d 67, 74 (2d Cir. 1980).

12. Air traffic controllers, by contrast, monitor flights for vertical and horizontal separation and communicate instructions and clearances to pilots. "[A]ir traffic controllers are not to get into the cockpit and fly the plane for the pilot." *In re Aircrash Disaster at Boston, Mass., July 31, 1973*, 412 F. Supp. 959, 981 (D.C. Mass. 1976) (internal quotations omitted).

13. "There is no duty to warn a pilot of a condition of which he would ordinarily know or of which he should be aware based on his training, experience and personal observations." *Beech Aircraft Corp.*, 51 F.3d at 840 (citing *Neff v. United States*, 420 F.2d 115 (D.C. Cir. 1969), *cert. denied*, 397 U.S. 1066 (1969)).

14. Furthermore, "controllers are not required to foresee or anticipate the unlawful, negligent or grossly negligent acts of pilots." *In re Air Crash at Dallas/Ft. Worth Airport*, 720 F. Supp. 1258, 1290 (N.D. Tex. 1989), *aff'd*, 919 F.2d 1079 (5th Cir. 1991), *cert. denied*, 502 U.S. 899 (1991).

15. This is "not [to] suggest that an air traffic controller is not required to take any action to attempt to prevent a crash[.]" *Beech Aircraft Corp.*, 51 F.3d at 840. Air traffic controllers are held to a standard of ordinary or reasonable care with respect to their responsibilities, which are concurrent with the duties of pilots. *Spaulding*, 455 F.2d at 226.

16. Until DeSalvo realized his mistake with the navigation radio less than one minute before the crash, both pilots were unsure why the navigational instruments were not working properly. The transcript of the pilots' conversation reveals that they were aware of the

problem. They were also obviously aware that the weather was unusually bad, requiring extra precaution. Under these circumstances, it was reasonable to notify air traffic control of the problem and ask for assistance and/or rerouting. In spite of all these difficulties, they persisted with the Hobby landing.

17. However, once DeSalvo and Dickson realized their radio error, both pilots knew why the ILS navigational aids, including the glideslope information, had not operated properly. At that point, the pilots had all the information about what had gone wrong so far, while the air traffic controllers had none. Under these circumstances, it was incumbent on the pilots to climb to a safe altitude, check the instruments again, and only then return for the landing. Instead, the mindset of the pilots, as represented by Dickson's comment that "[We're] just gonna have to do it this way[,]" was reckless.

18. Although the pilots of N86VT were dealing with a cavalcade of problems in the cockpit, to Denison in the Hobby tower, the approach of N85VT appeared wholly unremarkable.

19. The basic duties and responsibilities of air traffic controllers are found in the Air Traffic Control Handbook, FAA Order 7110.65 ("Controller's Handbook"). *Ross v. United States*, 640 F.2d 511, 519 (5th Cir. 1981).

20. In pertinent part, the Controller's Handbook provides:

> 2-1-6 SAFETY ALERT
>
> Issue a safety alert to aircraft if you are aware the aircraft is in a position/altitude which, in your judgment, places it in unsafe proximity to terrain, obstructions, or other aircraft. Once the pilot informs you action is being taken to resolve the situation, you may discontinue issuance of further alerts. Do not assume that because someone else has responsibility for the aircraft that the unsafe situation has been observed and the safety alert issued; inform the appropriate controller.
>
> *Air Traffic Control* Handbook, FAA Order 7110.65 § 2-1-6.

21. In this case, the approach of N85VT to Hobby closely adhered to the appropriate flight path and altitude for the great majority of the flight.  As N85VT neared Hobby, it began to descend somewhat too rapidly.  Had Denison noticed the problem, he would have been under a duty to alert the pilots.  However, Denison reasonably relied on the pilots' assurance that they were navigating relative to the ILS approach to runway four, a far more accurate navigational system than the radar-based altitude information available to him in the Hobby tower.

22. "The primary method of detecting unsafe proximity is through Mode C automatic altitude reports [i.e., MSAW]."  *Aeronautical Information Manual* § 4-1-15(a)(1), *Safety Alert* (2004).

23. Once the MSAW system alerted Denison to the dangerously low altitude of N85VT, he immediately issued the safety alert.  It was reasonable of Denison to rely on the MSAW system to alert him to the altitude problem in this case.

24. After the pilots inaccurately told Denison they were established on the ILS localizer for runway four, he had no reason to closely monitor N85VT.  Denison had cleared the flight to land, received assurance that the plane was navigating relative to the ILS localizer, and no other planes in the vicinity required monitoring for horizontal or vertical separation.

25. The pilots of N85VT descended below the minimum decision altitude even though they were unable to see the runway.  Without visual confirmation of the runway at the minimum altitude, they were required to abort the landing.  The Court finds that this error was the sole proximate cause of the accident.

26. Plaintiffs argue that had air traffic controllers done one thing differently, namely monitor the altitude of N85VT more closely, the accident might have been avoided.  This

contention may be true, but, in the absence of notice that something was awry with N85VT, the controller's duty of care does not extend to such intensive monitoring.

27. Plaintiffs also point out that Denison was working alone in the Hobby tower and O'Donnell was working alone at Houston TRACON on the morning of November 22, 2004. The Court finds that, given the volume of air traffic in the area at the time of the accident, it was reasonable to have one person working in each capacity.

28. Because the duty of care owed the pilots of N85VT was not breached by air traffic control, air traffic control was not negligent.

29. Even assuming, *arguendo*, that air traffic control did breach a duty of reasonable care, there could still be no finding of negligence on the part of the FAA in this case because the proximate cause of the accident was the pilots' descent below the minimum decision altitude despite being unable to see the runway.

30. "[W]hether *any* amount of cause should be attributed to the air controllers is a close one . . . ." *In re Air Crash at Dallas/Ft. Worth Airport*, 919 F.2d at 1088, n. 7 (emphasis in the original). During closing arguments, the Government appeared willing to concede that it may have been up to 25% responsible. The Court finds this estimate generous given the facts and declines to precisely apportion fault. Under the Texas comparative negligence statute, Plaintiffs could recover only were the pilots no more than 50% responsible for the accident. This accident was overwhelmingly caused by pilot error.

31. To the extent that any Finding of Fact is more properly characterized as a Conclusion of Law, it is ADOPTED as such. To the extent that any Conclusion of Law is more properly characterized as a Finding of Fact, it is ADOPTED as such.

IV. Conclusion

The pilots of N85VT unintentionally flew their plane into the ground, also known as a Controlled Flight Into Terrain ("CFIT") accident. While CFIT accidents are not unheard of, that unfortunate fact does not make the flight controllers or the Government responsible for the errors of the pilots. Because the FAA did not breach the legal duty of due care it owed the pilots of N85VT, Plaintiffs' negligence action FAILS.

SIGNED at Houston, Texas, this 12th day of January, 2010.

                                       MELINDA HARMON
                                UNITED STATES DISTRICT JUDGE